Fuld, J.
Charged with the shooting and killing of Arthur Holst on September 20, 1962, the appellant was convicted of murder in the first degree and sentenced to death. His codefendant, Hugo Krombholz, was also adjudged guilty but was declared insane prior to the imposition of sentence.
The body of the 17-year-old Holst was found, on the morning after he was killed, beside a dumbwaiter in the basement of the ice cream parlor in which he worked. He had been shot twice in the chest with a shotgun. The appellant, manager of the store, admitted committing the murder and implicated his codefendant Krombholz. The reason given by the appellant for his act was that his employer, who was also Holst’s, had instructed him to kill the boy because he was stealing money from the till.
Although the story given by the appellant in his statements may tax credulity, there can be no question that on the record before us his guilt was established beyond a reasonable doubt. The proof came not only from his confession and his possession of the murder weapon but also from the testimony given by Krombholz. If that were all there was to the case, we would have no alternative but to affirm, since no errors of any conse *212 quence were committed upon the trial. However, the facts revealed on the appellant’s motion for a new trial, concerning Krombholz’ long history of mental illness, compel a reversal.
The jury returned its verdict against both defendants on May 6, 1963. When they appeared before the court for sentencing some weeks later, the appellant was sentenced to death and Krombholz was sent to the Kings County Hospital for observation. A month thereafter, following psychiatric examination, Krombholz, found to be suffering from a ‘ ‘ longstanding mental illness ” and to be “ unaware of the situation in which he finds himself,” was certified as “ legally insane ” and committed to Matteawan State Hospital.
On the basis of this development, the appellant moved to set aside the verdict and the judgment and for a new trial, on the ground of newly discovered evidence, under section 465 of the Code of Criminal Procedure.[1] He urged then, as he urges now, that, since Krombholz was the only witness who directly implicated him, his testimony must have had a tremendous impact upon the jurors and that the verdict might well have been different had they known of his long history of mental illness. The trial judge, however, denied the motion on the ground (1) that the finding of insanity made after the trial did not mean that Krombholz was mentally ill when he testified; (2) that he, the judge, concluded from his observations of Krombholz that he ‘‘ understood the obligation of his oath and was competent to testify”; and (3) that, in any event, Krombholz’ testimony could not have materially affected the deliberations of the jury since the appellant’s conviction was “ a foregone conclusion ”.
The undisputed fact is that Krombholz ’ mental condition went back many years. He had had a head injury and a brain operation in 1947 and had several times been hospitalized for mental illness, his case being diagnosed in 1948 as one of “ Paranoid Schizophrenia ”. The psychiatrists, who found him insane *213 following the trial, stated that they were “ dealing with a longstanding mental illness ”, and the district attorney does not dispute this. Instead, it is his submission that Krombholz’ condition did not render his testimony inadmissible or require it to be rejected as a matter of law.
With this we are inclined to agree. The mere fact that one is insane or mentally ill does not per se disqualify him from testifying. He may give evidence, provided only .that he has sufficient intelligence to understand the nature of an oath and to give a reasonably accurate account of what he has seen and heard vis-a-vis the subject about which he is interrogated. (See Barker v. Washburn, 200 N. Y. 280, 283; Aguilar v. State of New York, 279 App. Div. 103, 104; District of Columbia v. Armes, 107 U. S. 519, 521.) The capacity of a person to be a witness is presumed and, if objection is made that he is incompetent, it is for the judge, in the exercise of his discretion, to determine his mental capacity to testify. (See People v. Washor, 196 N. Y. 104, 109-110; Aguilar v. State of New York, 279 App. Div. 103, 104-105, supra; Ellarson v. Ellarson, 198 App. Div. 103, 106; see, also, 2 Wigmore, Evidence [3d ed., 1940], §§ 478, 487.) “ We know both as a matter of definition and of observation ”, the court declared in the Barker case (200 N. Y. 280, 283, supra), “ that a person who would be judicially declared incompetent and unable to manage his affairs might nevertheless possess sufficient intelligence to be truthful and to describe simple occurrences as they were.”
These decisions do not, however, resolve the question presented. They simply stand for the proposition, in terms of the present case, that, if Krombholz’ mental condition had been put in issue during the trial, the court could have determined on the strength of its observations that he was capable of testifying as a witness.[2] But, in that event, the jurors would have learned, by reason of the examination to which he would have been subjected, that Krombholz had had a long history of mental illness and they would have been in a position to *214 assess and evaluate the testimony given by him and not accept it, as undoubtedly they did, as the statement of a “ normal ’ ’ individual. Indeed, the court remarked during the argument of the new trial application that Krombholz had acted normally throughout the trial and that his demeanor in the courtroom and on the witness stand had furnished no basis for inferring that there was “ something mentally wrong with him ”.
On this appeal, our inquiry must be, what would have been the reactions of the jurors had they been made aware that there was “ something mentally wrong” with Krombholz and had they known that he had ‘ ‘ visual and auditory hallucinations with marked memory defect ”, that he had been diagnosed “ as a case of Paranoid Schizophrenia ’ ’ and that he had been discharged from a sanitarium in 1950 “ against medical advice ”? We find it impossible to answer this question. On the one hand, the jury might have been reluctant to attach credence or weight to Krombholz’ story and base its verdict of guilt solely on the appellant’s confession — which he repudiated on the stand— and the other bits of evidence adduced by the prosecution. On the other hand, the jurors might have been persuaded that the appellant was guilty even without Krombholz’ testimony or they might have concluded that, mentally ill though he was, he was capable of reporting his talks with the appellant and describing the events which he observed before and after the killing. However, in a case such as this, when the punishment is death, we would not have our verdict to affirm rest on possibility or surmise. There is no need to remit the case for a hearing on the motion. On the record as it stands, the appellant is entitled, in the interests of justice, to a new trial (Code Grim. Pro., § 528).
Nor does our decision in People v. Salemi (309 N. Y. 208, supra) require a different conclusion. The court there affirmed a first degree murder conviction, although it appeared on a motion for a new trial that the witness who had identified the defendant was declared insane immediately after the trial. However, as a reading of the court’s opinion makes clear, that case differs from the one before us in that the matter relied upon by Salemi for a new trial “ was not new matter at all, but had been before the court and jury on the main trial ” (309 N. Y., at p. 212). More specifically, it had been brought *215 home to the jurors that the witness in question ‘ ‘ had blown ‘ his top ’ ”, had attempted to commit suicide by butting his head against the iron bars of the cell in which he was detained and had previously been confined in a mental hospital. The jurors were, therefore, aware that the witness may not have been “normal” and, in consequence, their assessment of his testimony was not made, as it was in the present case, without knowledge that he was, and long had been, mentally ill.
The judgment of conviction should be reversed and a new trial ordered.

. Evidence of a witness’ insanity may constitute newly discovered evidence within the sense of section 465 of the code. (See, e.g., People v. Brown, 13 N Y 2d 201, 205-206; People v. Salemi, 309 N. Y. 208; People v. Foiler, 229 App. Div. 789.) It matters not that the witness, later declared insane, was called by a codefendant in connection with his defense rather than by the prosecution; in either instance, the harm to the defendant against whom the witness testified is the same.

. However, the chances are that he would not have testified because of the fact that he was both an accused and a witness: if during the trial he had been sent to Kings County Hospital and found to be insane, he would in all likelihood have been committed to Matteawan and, in consequence, would not have appeared as a witness.